**UNITED STATES of America, Appellee,**

v.

**Julian S. H. WEINER, Marvin Al Lichtig and Solomon Block, Appellants.**

No. 75–2973.

United States Court of Appeals,
Ninth Circuit.

May 15, 1978.

As Amended on Denial of Rehearing and Rehearing En Banc July 21, 1978.

762

Nathan Markowitz (argued), of Sands & Markowitz, Beverly Hills, Cal., Richard A. DeSantis (argued), Los Angeles, Cal., Gerry L. Ensley (argued), Beverly Hills, Cal., for appellants.

William J. Rathje, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellee.

Before CHOY and GOODWIN, Circuit Judges, and THOMPSON,* District Judge.

PER CURIAM: **

Julian Weiner, Marvin Lichtig, and Solomon Block appeal their respective convictions for securities fraud arising out of their employment as auditors of Equity Funding Corporation of America (Equity Funding) during the time covered by the indictment.

Equity Funding was incorporated in 1960 to sell life insurance, mutual funds, and "equity funding" programs.[1] The company operated legitimately and profitably until 1964, when, the government proved, it began to publish inaccurate and false financial statements. Equity Funding was accused of massive fraud in overstating its income and claiming nonexistent assets in order to increase the market value of its stock.

Wolfson, Weiner, Ratoff, and Lapin were the independent public accountants for Equity Funding from 1961 until 1971. In early 1972, the Los Angeles branch of the Wolfson, Weiner firm joined with the accounting firm of Seidman & Seidman. The combined firm served as Equity Funding's independent public accountant until the exposure of the fraud in 1973.

Julian Weiner was the Wolfson, Weiner partner in charge of the audits of Equity Funding from 1961 to 1973. He was convicted of six counts of securities fraud, 15 U.S.C. §§ 77x, 77q(a), for accounting practices which fraudulently overstated the income and assets of Equity Funding, and of four counts of willfully making untrue statements to the Securities Exchange Commission (SEC) and the New York or Pacific Coast Stock Exchanges, in violation of 15 U.S.C. §§ 77x, 77f, 78ff, 78m.

Marvin Lichtig, as an employee and later as a junior partner of Wolfson, Weiner, supervised the audit field work of Equity Funding for the audits between 1963 and 1968. He reported directly to Julian Weiner. From 1968 until 1973, Lichtig served as an officer of Equity Funding and signed registration statements as the principal accounting officer of the company. Lichtig was convicted of the same six counts of securities fraud as Weiner. Lichtig was also convicted of seven counts of filing false statements with the SEC and the New York or Pacific Coast Stock Exchange in violation of 15 U.S.C. §§ 77x, 77f, 78ff, 78*l*, 78m.

Solomon Block was employed by Wolfson, Weiner in 1968 and replaced Lichtig as the supervisor of field audits. Block served as supervisor for the 1969 through 1972 audits. Block was charged with the same six counts of securities fraud as Weiner and Lichtig, but Block was convicted of only five of the counts. Block was convicted of two counts of making false statements to the SEC and the New York or Pacific Coast Stock Exchanges in violation of 15 U.S.C. §§ 77x, 77f, 78ff, 78m.

---

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

** All three members of the panel shared equally in the writing of this decision.

1. In "equity funding" or "life funding" programs, a participant purchases mutual funds for cash; at the same time, the participant purchases life insurance with funds borrowed from the company by pledging the mutual funds as security.

## A. UNANIMOUS VERDICT

Defendants argue that the convictions must be reversed because the jury verdict was not unanimous. This challenge is based on juror affidavits.

The jury returned a verdict of guilty, and each member of the panel was polled. The judge asked "please indicate by answering if the verdicts just read are your verdicts," and each juror responded individually in the affirmative. The verdicts were received and the jury was discharged. Half an hour later, a juror went to the judge's chambers and said that she had never voted "guilty", but rather had voted "guilty with reservation" during the jury's deliberations. She further stated that she understood that the jury's verdict was eleven "guilty" and one "guilty with reservation", and was confused by the events in the courtroom when she responded affirmatively that the verdict rendered was her verdict. Two other jurors made affidavits to support this juror's statement that she had always qualified her "guilty" vote "with reservation".

The defendants moved for a new trial, based on the affidavits of the three jurors. The district judge denied the motion, holding that the affidavits were not admissible to impeach the verdicts.

■ The district court followed established law. Jurors may not impeach their own verdict. *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). This rule, with narrow exceptions, is codified in Fed.R.Evid. 606(b).

Defendants argue that they are not seeking to impeach the verdict. They contend that the verdict rendered in court was not the true verdict of the jury and the affidavits should be admissible to prove this fact. They cite *Fox v. United States,* 417 F.2d 84 (5th Cir. 1969). In that case, a juror remained silent when polled, and other jurors by affidavit said they thought a verdict by

a majority was sufficient. The court held that there was no legal verdict. But here there was a verdict, and upon a poll of each juror in open court it was unanimous. Even if the defendants were able to prove that one juror had consistently voted "guilty with reservation", the only purpose of such testimony would be to impeach the verdict. The meaning of "with reservation" would thus be left to the ingenuity of counsel and the vagaries of social behavior in every case.

■ The juror answered in the affirmative when asked if "guilty" was her verdict. Many jurors have some second thoughts about their verdicts. "Beyond a reasonable doubt" need not exclude all doubt. To permit this juror to contradict this verdict by an explanation that her vote was "guilty with reservation" would sanction the impeachment of any verdict in which a juror could be found who was willing to repudiate the answer he gave when polled.[2] Opportunities for harassment of jurors and jury tampering would abound. Such a burden on the jury system could not long be tolerated.

## B. THE "ALLEN CHARGE"

The defendants also argue that the jury was coerced by the giving of the *Allen* charge.[3] After 5 days of deliberations, the foreman of the jury notified the judge that "one of the members of our jury feels unable to participate in deliberations with the rest of us." After ascertaining that the juror was not suffering from a physical or mental disability, the judge gave a modified *Allen* instruction substantially as set out in E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 17.18 (2d ed., 1970). (This instruction is § 18.14 in the Third Edition, 1977.)

■ This court has consistently upheld this form of the *Allen* charge. *Sullivan v.*

---

**2.** In *United States v. Lustig,* 555 F.2d 737 (9th Cir. 1977), we said: "Lustig would have a valid objection if one or more jury members expressed some uncertainty as to the verdict." But we were speaking of the expression of the uncertainty at the time of the poll, not after the

jurors had been excused and subjected to out-of-court cultivation.

**3.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

*United States*, 414 F.2d 714 (9th Cir. 1969). The cases which discuss the assumed effect of the *Allen* charge are all appealed by defendants who were convicted. Defendants who have been acquitted after the giving of the charge have not complained. Upon review of all the circumstances of the case, we hold that the supplemental instruction was not coercive.[4]

## C. PREJUDICIAL COMMUNICATIONS

■ During the trial, the prosecutor learned that two jurors had been on an elevator during a conversation between a government attorney and a government witness. The prosecutor notified the trial judge, who called a conference in chambers with all parties to the conversation plus defense counsel. The judge determined that nothing prejudicial had been said. There was no motion for a mistrial. Defense counsel now assert that there was something sinister about the event. The record, however, reveals no reason for disturbing the trial court's discretion in handling the matter.

■ The same juror who had expressed her reservations in the jury room and later in a posttrial affidavit also stated in her affidavit that during the deliberations she had initiated a conversation with the bailiff by asking whether the judge expected a verdict. She said the bailiff told her that he didn't know, but he assumed that the judge would "like" a verdict. The bailiff, by affidavit, denied the conversation. In any event, the defendants fail to show how such a conversation, if it occurred, could have prejudiced anyone. Since the alleged conversation occurred, if it occurred at all, nearly a week after the judge had given the *Allen* charge earlier complained of, it should have been apparent to even the most obtuse juror that a verdict would be a welcomed development. We find no basis for charging the trial judge with an abuse of discretion for refusing to grant a new trial

upon this sort of clutching at straws. It was a long trial, and such trials frequently produce a number of imperfections. It is to the credit of the experienced trial judge that this is the sort of assignment of error to which the appellants apparently must look in their search for reversible error.

## D. ALLEGED MISCONDUCT BY PROSECUTOR

■ Appellant *Lichtig* claims that the prosecutor made an impermissible reference in final argument to his and Block's failure to take the stand. Block's attorney, in his part of the summation, had made a reference to certain evidence thought to be exculpatory of Block. The prosecutor in his final argument referred to "Julian Weiner's exculpatory testimony" and the absence of other testimony on the point. None of these comments trespassed upon the rule against calling attention to failure to testify. The jury knew very well that neither Block nor Lichtig had testified, and, if this failure left some unanswered questions in the minds of jurors, that was a risk that had been assumed long before final argument. The government took no unfair advantage of the situation, and there was no error in refusing a new trial on this score. The trial court carefully instructed the jury about the presumption of innocence, the burden of proof, and the right of the defendant to refrain from testifying.

■ Lichtig and Block also complain about the exploitation by the prosecutor of the term "reciprocal income"[5] during the course of the trial. The point is frivolous. "Reciprocal income" and "reciprocals" were terms commonly used in the reporting of inflated or nonexisting assets. The trial court carefully instructed the jury that there was nothing illegal about reciprocal income. The illegal conduct consisted of making false or exaggerated reports about "reciprocal" and other kinds of income.

4. We have recently held that giving the instruction a second time is erroneous per se, *United States v. Seawell*, 550 F.2d 1159 (9th Cir. 1977).

5. "Reciprocal income" was a term used to describe a practice by brokers, until it was discontinued, of sharing commissions on market transactions with the insurance producers.

## E. ALLEGED IMPERMISSIBLE RESTRICTION OF CROSS–EXAMINATION OF WITNESS LOWELL

The interrogation of Samuel Lowell, one of the government's principal witnesses, commenced in the afternoon of Friday, February 21, 1975. At the close of that session the trial was continued to 9:30 a.m. on Tuesday, February 25, 1975. The direct examination continued through Tuesday and for a very short time Wednesday morning, when the case was continued to Thursday on motion of defense counsel. Cross-examination by Mr. Abeles for defendant Weiner lasted all day Thursday and all day Friday. Mr. DeSantis, representing defendant Lichtig, commenced cross-examination late Friday afternoon. On adjournment, the trial was continued to Tuesday, March 11. Mr. DeSantis cross-examined Lowell all day Tuesday, and half of Wednesday morning. Mr. Markowitz, representing defendant Block, then took over and completed his questioning in the middle of the afternoon.

In addition, during the government's case, the court permitted defense counsel to recall Mr. Lowell for further cross-interrogation on March 20, 1975.

■ During cross-examination there were numerous and repetitive attacks upon the credibility of the witness. Counsel probed Lowell on extramarital relationships and participation in fraudulent conduct not charged in the indictment. It will serve no useful purpose to detail the specific instances in which defendants claim that cross-examination was improperly curtailed or restricted. With respect to each such assignment of error, the impeaching information came to the attention of the jury. The attack is only upon the court's refusal to permit counsel unrestricted license to exhaust the details of the particular circumstance or transaction. There was no error.

■ The scope and extent of cross-examination is within the discretion of the trial court, and the court's limitation of cross-examination will not result in reversal unless it is clear that a defendant was thereby denied his constitutional right to confrontation. *Smith v. Illinois*, 390 U.S. 129, 132, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *United States v. Haili*, 443 F.2d 1295, 1299 (9th Cir. 1971); *Enciso v. United States*, 370 F.2d 749 (9th Cir. 1967).

■ The court in its discretion may limit cross-examination in order to preclude repetitive questioning, upon determining that a particular subject has been exhausted, or to avoid extensive and time-wasting exploration of collateral matters. *See, e.g., United States v. Zane*, 495 F.2d 683, 695 (2d Cir. 1973); *United States v. Miller*, 463 F.2d 600 (1st Cir. 1972).

■ The trial court has a duty to control cross-examination to prevent it from unduly burdening the record with cumulative or irrelevant matter. *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Carrion*, 463 F.2d 704, 707 (9th Cir. 1972). This duty includes a specific duty to prevent counsel from confusing the jury with a proliferation of details on collateral matters. *United States v. Carrion*, 463 F.2d at 707. *See also* Fed.R.Evid. 403 and 608(b).

## F. ACCESS TO AND ADMISSIBILITY OF EXCULPATORY EVIDENCE

Apparently two pages of notes made by prosecutor Rathje of an interview with Fred Levin, a government witness, were supplied to the defense and used by the defense in cross-examination. The government then offered the notes as evidence. Defendants objected. They wanted the notes to be censored before submission to the jury. Later the government withdrew the offer. The exhibit was never reoffered by defense counsel. The alleged error was not preserved for appellate review. This is certainly not a situation, as suggested by defense counsel, where the government has withheld or suppressed exculpatory material as was the case in *Brady v. Maryland*, 373 U.S. 83, 86–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See United States v. Agurs*, 427 U.S. 97, 107–14, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■ Appellant Lichtig says his constitutional rights were infringed by the government's failure to disclose a pretrial agreement (in a companion civil action) between the trustee in reorganization and the previously mentioned Lowell which allegedly absolved Lowell of civil liability in the Equity Funding litigation. Here, the verdict of the jury was returned on May 20, 1975, defendants were sentenced on July 14, 1975, and appeals were taken on July 24, 1975. Lichtig claims he discovered the existence of the agreement on May 7, 1976, almost a year after the conclusion of the trial. However, the record on appeal does not contain any evidence of the agreement or of the government's knowledge that such an agreement existed. The issue is therefore not properly before us.

■ Lichtig also complains of the denial of his oral motion during the trial for an order requiring the government to lodge all SEC transcripts and statements and interviews with witnesses by the Federal Bureau of Investigation, the postal service, or anyone else that were in the possession of the United States Attorney, for the court's examination to ferret out possible *Brady* material. As the Supreme Court noted in *United States v. Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399, a request "for 'all *Brady* material' or for 'anything exculpatory'" is equivalent to no request at all. The trial judge need not accord the slightest heed to such a shotgun approach. This attempt to create error has as little merit as the one preceding it.

## G. DISQUALIFICATION OF U. S. ATTORNEY'S OFFICE

Appellant Block asserts error in the refusal of the trial judge to disqualify the United States Attorney's office from prosecuting the case. An attorney employed by the law firm of Nelson, Liker & Merrifield while that firm represented Weiner and Block in connection with matters arising out of the Equity Funding fraud left the firm and went to work for the SEC.

Appellant suggests, but the record does not confirm, close cooperation between the SEC and the Department of Justice in the management of this prosecution.

In order to disqualify the U.S. Attorney's office, the court would first have to impute to the former private attorney knowledge of the Equity Funding litigation possessed by other members of his former law firm. Second, the court would have to impute this same knowledge to the other attorneys at the SEC. And third, the court would have to impute all SEC knowledge to the office of the United States Attorney by virtue of the alleged cooperation between the Department of Justice and the SEC.

■ The first step of the exercise may be possible (*see Laskey Brothers v. Warner Brothers Pictures, Inc.*, 224 F.2d 824, 826–27 (2d Cir. 1955)), but the logic thereafter becomes tenuous. Problems concerning the imputation of knowledge to government attorneys are *sui generis*. A free flow of information may be assumed to exist within a law partnership, but the size and diversity of many government agencies makes similar assumptions about agencies wholly unrealistic. *See United States v. Standard Oil Co.*, 136 F.Supp. 345, 360–63 (S.D.N.Y.1955). There is nothing in the record before us to support a finding that the named employee of the SEC ever investigated or passed upon the subject matter of the instant case, or that information pertaining to this case ever reached him. *Cf. General Motors Corp. v. City of New York*, 501 F.2d 639, 651 (2d Cir. 1974). As this court noted in *Gas-a-Tron of Arizona v. Union Oil Co.*, 534 F.2d 1322, 1325 (9th Cir. 1976), we will not disturb the district court's exercise of its discretion in dealing with challenges to government attorneys as long as the record reveals no sound basis for disqualification. The record in this case supports the district court's refusal to disqualify the United States Attorney's office.

## H. COCONSPIRATOR HEARSAY EXCEPTION

The government originally charged twenty-two defendants on 105 counts. Twenty-two of those counts involved Weiner, Lich-

tig, and Block. Count 1 alleged a conspiracy between Weiner, Lichtig, Block and some of the other defendants.

Two counts involving Weiner, Lichtig, and Block were dismissed after presentation of the prosecution's case in chief. At the close of all the evidence, the government withdrew two other counts—the conspiracy charge and a mail-fraud charge (Counts 1 and 2). The court dismissed those counts, leaving sixteen counts (Counts 6, 10–14, and 75–84) for presentation to the jury.

At the time the conspiracy count was withdrawn, the defendants moved to strike all testimony admitted under the coconspirator exception to the hearsay rule. Previous timely exceptions had been made to the admission of the testimony. The motions were denied. Appellants now contend that the dismissal of the conspiracy count by the court made inadmissible all statements previously received under the exception. Alternatively, they claim that even if there was no absolute bar to the testimony, it was inadmissible because the standards of admissibility under the exception had not been met since there was insufficient proof *aliunde* of the conspiracy and defendants' connection with it.[6]

■ Defendants' first contention, that the mere dismissal of the conspiracy count mandated striking all testimony previously admitted under the hearsay exception, is frivolous. The eventual submission of the charge does not determine the admissibility of the evidence.

■ This circuit has established that coconspirator hearsay is admissible only when a foundation is laid to show that: (1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it. *United States v. Snow*, 521 F.2d 730, 733 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct.

883, 47 L.Ed.2d 101 (1976). *See also United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977); *United States v. Calaway*, 524 F.2d 609, 612 (9th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976); *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964). It is not necessary for a charge of conspiracy to have been brought in order for coconspirator hearsay to become admissible. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Williams*, 435 F.2d 642 (9th Cir. 1970), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971); *Lee Dip v. United States*, 92 F.2d 802, 803 (9th Cir. 1937), *cert. denied*, 303 U.S. 638, 58 S.Ct. 526, 82 L.Ed. 1099 (1938). Nor is the exception limited to trials where coconspirators are also codefendants. *United States v. Randall*, 491 F.2d 1317 (9th Cir. 1974); *United States v. Williams, supra.*

■ The trial judge initially decides whether the declarations of coconspirators are admissible. There is no set order of proof. The admission of the evidence subject to a motion to strike because of the insufficiency of proof of the necessary preliminary facts is well within the trial judge's discretion. *United States v. Testa*, 548 F.2d at 852; *United States v. Knight*, 416 F.2d 1181, 1185 (9th Cir. 1969).

In this case the disputed statements were clearly made during and in furtherance of the conspiracy. The only question is whether there was sufficient independent evidence of a conspiracy and the defendants' connection to it.

■ The quantum of independent proof necessary for the application of the coconspirator hearsay exception is sufficient, substantial evidence to establish a prima facie case that the conspiracy existed and that the defendant was a part of it. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Testa*, 548 F.2d at 853; *United States v. Calaway*,

---

**6.** The trial took place prior to the effective date of Pub.L. 93–595, § 1, 88 Stat. 1932 (1975), which created the codified Federal Rules of Evidence. Prior law is therefore applicable.

524 F.2d at 612; *United States v. Spanos,* 462 F.2d 1012 (9th Cir. 1972); *Carbo v. United States, supra.*

▆ Once the existence of a conspiracy has been established, independent evidence is necessary to show prima facie the defendant's connection with the conspiracy, even if the connection is slight.[7] *United States v. Freie,* 545 F.2d 1217, 1221–22 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 1645 (1977); *United States v. Knight, supra.*

Several officers and officials of Equity Funding who had pleaded guilty, including Jerome Evans, Treasurer until 1968, the earlier-mentioned Samuel Lowell, Controller, and Michael Sultan, Assistant Controller, testified for the prosecution. Other Equity Funding employees, and auditors and SEC examiners who had reviewed the company's financial records after discovery of the fraud also testified.

It is undisputed that the financial records of Equity Funding did not accurately reflect the financial condition of the company and its subsidiaries. Testimony about particular fraudulent financial transactions and recordkeeping abounds in the record. For example, both Sultan and Lowell testified about the purchase of Investors Planning Corporation of America (Investors Planning) in 1969. The total cost of the acquisition was approximately $10 million, $2 million assigned to book value and approximately $8 million to excess cost that included the value of the sales force acquired and of the contractual plans acquired.[8]

Thereafter, because of a shortfall in the Funded Loans and Receivables Account, the prime source of the company's paper profit, it was decided to revalue the future premiums due under an account entitled "Clients Contractual Receivables," which allegedly represented the trail commissions[9] due on the Investors Planning programs. In order to substantiate the transaction, Stanley Goldblum, the president of Equity Funding, wrote a letter to the auditors informing them that a sale was in process and that he would personally guarantee a purchase of the trail commissions for close to the amount of the recorded value. After debits for commissions payable, Equity Funding increased its paper income by over $13 million by this accounting treatment of the contractual commissions. No real sale was anticipated. Lowell and Sultan testified that $2 million in funds from Equity Funding was routed through two shell corporations in Europe and then paid back to Equity Funding as the supposed down payment on the purchase. Thus, Equity Funding paid itself, and the value recorded was never received.

Other improprieties testified to by various Equity Funding employees included falsification of confirmations for various assets claimed by Equity Funding. Another example was the insertion of a $2 million plug in the total of the detail[10] making up the Funded Loans Receivable portion of the Funded Loans and Accounts Receivable account. The $2 million did not appear on the computer printouts of the detail, but only in the total. In later years the detail

---

7. *Cf. United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977) (discussing the slight evidence rule in the context of sufficiency of the evidence).

8. Investors Planning sold contractual plans for the purchase of mutual funds. These plans did not involve an actual contractual agreement, but merely denoted programs where commissions on the sale of mutual funds were collected in such a manner that up to 50 percent of the commissions were collected in the first year and the balance of the commissions were spread out over the remainder of the period of acquisitions, an average of 12½ years. The actual amount of commissions collected on a completed program was approximately equivalent to that collected under other kinds of payment plans. Purchasers of mutual funds were under no obligation to complete the plan and could withdraw at any time, thus relieving themselves of any future commission obligation as well.

9. Trail commissions represent commissions not yet collected but expected as future sales under the programs are made.

10. Detail is the term for the individual components of an account.

sheets substantiated the total, but the full account numbers were not given and accounts were randomly duplicated within the detail until the desired sum was reached. In addition, various notes receivable were created with shell corporations, some of which continued on the books at full value even after the date of maturity despite nonpayment.

The testimony of the various Equity Funding officials about their personal participation in and knowledge of the various schemes showed an obvious common purpose and practice intended to inflate falsely the reported value of Equity Funding. Auditors and examiners who reviewed the financial records under the direction of the company's receiver and the SEC confirmed the testimony of the employees.

█ The existence of a conspiracy to provide false information to the public and to the SEC is firmly established.

Defendants' second contention, that there was insufficient independent evidence of the connection of each defendant to the conspiracy, also fails. The record again supplies ample evidence upon which the trial judge could have determined that prima facie proof existed to establish the necessary connection of each defendant with the conspiracy.

The lack of agreement between the financial statements and the actual finances of Equity Funding is relevant because each defendant, Weiner, Lichtig, and Block, was involved in at least one of the audits as an independent auditor. Weiner and Lichtig were responsible for the 1968 audit, and Weiner and Block were responsible for the audits prepared for 1969, 1970, and 1971. Lichtig became Treasurer of Equity Funding during the 1968 audit. Lichtig had bought shares of Equity Funding while still acting as an independent auditor. Defendants each had several meetings with Equity Funding officials involved in the financial manipulations. Frank West, a CPA employed by Wolfson, Weiner, Ratoff and Lapin, who worked on audits of Equity Funding from 1969 through 1972, and Samuel Lowell both testified to conversations with defendants about questionable transactions.

The workpapers of defendants did not reveal requests for confirmation of the amount of collateral being used as security for outstanding funded loan programs, and for the amount of internally held funding programs. Various arithmetical calculations that were incorrect in the original worksheets or Equity Funding calculations were not corrected, even in one case where the worksheets revealed that the auditors were aware of the mistake. There was much give and take between Weiner, and later Block, and the Equity Funding officials in attempts to develop auditing methods that would show income in amounts the company felt was desirable.

█ The responsibilities of defendants were also established by testimony regarding their own statements and actions. Extrajudicial declarations made by defendants themselves are not hearsay, but qualify as independent evidence. *United States v. Calaway,* 524 F.2d at 613; *Klein v. United States,* 472 F.2d 847 (9th Cir. 1973). Such evidence included (1) Block directing auditors working under him not to pursue certain areas that involved fraudulent or falsified information despite the auditors' requests for further information, and (2) Weiner suggesting accounting procedures that obscured Equity Funding's true financial situation.

█ Independent evidence to connect defendants with the conspiracy for the purpose of admitting the hearsay declarations was abundant. Some of the evidence is circumstantial; but circumstantial evidence can provide the necessary quantum of proof. *United States v. Calaway,* 524 F.2d at 612. Once the judge determines that the hearsay evidence is admissible, the weight to be given that evidence becomes a question for the jury. *United States v. Ragland,* 375 F.2d 471 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); *Carbo v. United States,* 314 F.2d at 737.

We hold that the evidence heard under the coconspirator hearsay exception to the

hearsay rule was properly admitted. A prima facie case was made for the existence of a conspiracy and the involvement of the particular defendants in it.

Defendants further contend that the testimony of Lowell, Sultan, John Templeton (who served as Controller of Equity Funding from 1968 to 1969), and others concerning extrajudicial declarations by Goldblum violated their right of confrontation because the prosecution never called Goldblum as a witness.

Goldblum was called by the defense but refused to testify after asserting his Fifth Amendment right against self-incrimination. Goldblum's extrajudicial statements were admissible as discussed above under the coconspirator exception.

██ The admissibility of evidence under the coconspirator exception, however, does not automatically demonstrate compliance with the confrontation clause. *United States v. Snow,* 521 F.2d 730, 734 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Baxter,* 492 F.2d 150 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

In *Dutton v. Evans, supra,* the Supreme Court dealt with a situation where a third party testified to a conversation with Evans's codefendant, Williams, who was tried separately. Williams did not testify at Evans's trial. The Court did not indicate whether Williams was available to testify, and did not address the issue. In dealing with the relationship between the coconspirator hearsay exception and the Sixth Amendment, the Court acknowledged that the confrontation clause does not bar the admission of all hearsay. 400 U.S. at 80, 91 S.Ct. 210. Although the hearsay rule and the confrontation clause have a similar basis, the two do not precisely overlap. 400 U.S. at 82, 91 S.Ct. 210, *quoting from California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Under *Dutton* an analysis must be made to determine whether there are sufficient indicia of reliability to permit the introduction of the hearsay declarations in spite of the lack of opportunity for the defendant to cross-examine the declarant.

██ *United States v. Snow, supra,* is instructive in this case. Snow contended that testimony by a DEA agent regarding declarations of a coconspirator denied his right of confrontation. The government argued that the defendant had been equally free to subpoena the declarant. We held that the testimony contained sufficient indicia of reliability to meet the *Dutton v. Evans* standards and that:

"While it is unquestioned that the government has the burden of producing evidence showing the guilt of the accused beyond a reasonable doubt, it does not have the burden of calling every witness whose testimony would support a verdict of guilty, and it need not call a witness, equally available to both sides, merely because cross-examination of such a witness might prove helpful to the defense case." *United States v. Snow,* 521 F.2d at 736.

Goldblum was equally available to both sides during the trial, and was in fact called by the defense. He chose to assert his constitutional right against self-incrimination, and his testimony thus became unavailable to both sides.[11] The failure of the prosecution to call Goldblum as its witness did not constitute grounds for reversal.[12]

Once Goldblum's refusal to testify and his resulting unavailability are established and cross-examination is thus precluded, the next question is whether there are sufficient indicia of reliability to permit introduction of his declarations without violating the Sixth Amendment.

---

11. Coconspirator hearsay admissibility does not depend upon the declarant's unavailability. 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶¶ 800[04], 804(a)[01]; Fed.R.Evid. 804.

12. The defendants' contention that the government was obliged to grant immunity to Goldblum so that he might testify on their behalf is also meritless. The Sixth Amendment contains no such requirement. *United States v. Bautista,* 509 F.2d 675, 677 (9th Cir.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

"* * * The relevant factual inquiry is whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration. * * *" (Citations omitted.) *United States v. Adams,* 446 F.2d 681, 683 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

*Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Dutton v. Evans, supra; United States v. Baxter,* 492 F.2d at 177.

■ Among the factors to be considered in determining the reliability of the hearsay declarations is whether the witness testifying would have had knowledge of the roles and identities of others within the conspiracy. Also significant is whether the witness's recollection of the declarant's statements is likely to be accurate and whether the declarant would have had any reason to have lied to the witness. The court must determine whether cross-examination of the declarant would be likely to show that the declarant's statements were unreliable.[13] Another important determination is whether the evidence is "crucial" or "devastating" to the defense. *Dutton v. Evans,* 400 U.S. at 87, 91 S.Ct. 210; *United States v. King,* 552 F.2d 833 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *United States v. Snow,* 521 F.2d at 735; *United States v. Adams,* 446 F.2d at 684.

■ Employing the *Dutton* approach,[14] we hold that Goldblum's declarations contained sufficient indicia of reliability and were properly admitted. Each of the witnesses testifying about Goldblum's extrajudicial declarations was involved in the day-to-day running of the company. They were officers and employees of Equity Funding, and the conversations to which they testified were directed to the operation of the corporation and the maintenance of its fi-

nancial records. The witnesses were talking from personal knowledge. Because of their positions within the company and, in some cases, within the conspiracy, it is unlikely that Goldblum would have been lying to them. The testimony of Lowell, Evans, and others who were among the original persons charged also contained statements against their own penal interests, a further badge of reliability.

■ Finally, none of the declarations was "crucial" or "devastating." There was abundant evidence regarding the manipulation of Equity Funding's financial record-keeping, and the conversations with Goldblum were not a major component of proof against the defendants. In fact, so substantial was the other evidence that, even if error, the admission of Goldblum's declarations would have been error harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Adams,* 446 F.2d at 684.

## I. ADMISSIBILITY OF LICHTIG WORKPAPERS

Appellant Lichtig alleges error in the receipt in evidence of workpapers produced by Lichtig in 1968. He cites *Gallego v. United States,* 276 F.2d 914 (9th Cir. 1960). Nothing in *Gallego* supports this assignment of error.

■ Lichtig contends that the chain of custody of the workpapers between 1968 and the trial was incomplete and that the workpapers themselves were incomplete. Assuming these insufficiencies, the trial judge has discretion to admit the workpapers into evidence if he "is satisfied that in reasonable probability * * * [they have] not been changed in important respects"; the jury is free to weigh the evidence according to its own evaluation of its authenticity. *Gallego v. United States,* 276 F.2d at 917; *Williams v. United States,* 381

---

**13.** *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

**14.** *See also Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), where the Court reemphasizes the significance of the reliability of the offered evidence.

F.2d 20 (9th Cir. 1967). This court said, in *United States v. King:*

"It is the function of the trial court to determine whether proffered evidence has enough prima facie trustworthiness to warrant its consideration by the jury, and generally the sufficiency of a showing of authenticity of a writing sought to be introduced into evidence is a matter within the discretion of the trial judge. * * * " 472 F.2d at 7.

In this case, there was substantial testimony from witnesses who had used the workpapers or who knew the handwriting, identifying and authenticating the workpapers. The court did not abuse its discretion. *See United States v. Brown,* 482 F.2d 1226 (8th Cir. 1973).

## J. ALLEGED ERROR IN QUASHING SUBPOENA FOR THE "PARKER REPORT"

Appellant Weiner alleges error in the court's suppression of a subpoena duces tecum for the Parker Report. The Parker Report resulted from an investigation made for the guidance and information of the attorneys retained by the accounting firm of Seidman & Seidman to defend numerous civil actions filed as a consequence of the Equity Funding fraud. Parker was a partner of Seidman & Seidman. Weiner, as noted earlier, was a partner of Seidman & Seidman at the time the report was prepared. Block also joined Seidman & Seidman in the merger with Wolfson, Weiner.

Block's attorney caused a subpoena duces tecum to be issued to the attorneys for Seidman & Seidman for a copy of the Parker Report. The Seidman & Seidman attorneys moved to quash or suppress the subpoena claiming attorney-client and work-product privileges. The motion to suppress Block's subpoena was granted. With respect to Weiner, who assigns the error on appeal, the subpoena was never ruled upon. Action on the motion was withheld or suspended at Weiner's request, and the motion was never thereafter properly brought before the court for action. There is no basis for an assignment of error.

In the reply brief Weiner states: "Weiner had every reason to believe that the 'Parker' report contained totally exonerating information regarding his personal absence from all of the auditing functions at * * * [Equity Funding]." This speculation is unsupported by anything in the record. In the same brief, Weiner seeks to rely on *United States v. Agurs, supra,* and *Brady v. Maryland, supra,* to support this assignment of error. How prosecutorial misconduct in a *Brady* context can be inferred in this situation is not demonstrated.

## K. DENIAL OF BLOCK'S MOTION TO SUPPRESS HIS TESTIMONY BEFORE THE SEC

Block contends that he was deprived of his right to counsel during his various appearances at investigative hearings before the SEC. More specifically, Block asserts that counsel who appeared with him during his testimony before the SEC, and upon whose advice he decided to testify, had a conflict of interest because the attorneys' law firm represented certain accounting firms of which Block was a present or past employee at the same time the attorneys were appearing with Block. The trial court denied Block's motion to suppress his testimony before the SEC, after finding that Block had not been deprived of his right to counsel and that he had voluntarily waived his right to be represented by his own attorney.

 It is firmly established that a party compelled to appear before an investigation by the SEC has a right to retain counsel. The Administrative Procedure Act, 5 U.S.C. § 555(b), provides in pertinent part:

"A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding * * * ."

This right to have an independent counsel can, however, be waived. *See United States v. Kutas,* 542 F.2d 527, 530 (9th Cir. 1976); *United States v. Frame,* 454 F.2d 1136, 1138 (9th Cir. 1972); *Kaplan v. United States,* 375 F.2d 895 (9th Cir. 1967). Here, the finding of waiver by the trial judge is amply supported by evidence.

## L. DENIAL OF SUPPRESSION OF BLOCK'S BANKRUPTCY TESTIMONY

Block personally was adjudicated a bankrupt on November 14, 1973. He testified at the first meeting of his creditors on December 11, 1973, which was continued on January 7, 1974, and June 24, 1974. On January 7, 1974, Block refused to answer certain questions on Fifth Amendment grounds. The district court held Block to be in contempt. To purge himself of contempt, he then answered the questions.

Prior to trial, Block moved for suppression of any evidence obtained by the government from the testimony given by him at those first meetings of his creditors. He based his motion on section 7(a)(10) of the Bankruptcy Act, 11 U.S.C. § 25(a)(10), which in pertinent part provides that the bankrupt shall:

"* * * [A]t the first meeting of his creditors, at the hearing upon objections, if any, to his discharge and at such other times as the court shall order, submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate or the granting of his discharge; but no testimony, or any evidence which is directly or indirectly derived from such testimony, given by him shall be offered

in evidence against him in any criminal proceeding, except such testimony as may be given by him in the hearing upon objections to his discharge * * *." [15]

This immunity cast on the government the heavy burden of affirmatively showing that the evidence it intended to present was derived from a legitimate source wholly independent from Block's bankruptcy testimony. *Kastigar v. United States,* 406 U.S. 441, 461–62, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Block v. Consino,* 535 F.2d 1165, 1169 (9th Cir. 1976).

The trial court denied Block's motion to suppress, ruling that the government's affidavits and testimony met the burden. Prior to its ruling, the court offered to allow Block to call additional witnesses in support of his motion if he presented a written summary showing how his testimony before the SEC [16] differed from his bankruptcy testimony, and if he represented that those witnesses could give competent and relevant testimony. Otherwise, the court thought, there was nothing in the bankruptcy proceedings which was not covered before the SEC. Block's counsel said a comparison of the SEC and the bankruptcy testimonies would be attempted. However, nothing was done to comply with the court's suggestion, and Block did not raise the subject again.

Block now contends that the district court improperly put the burden upon him to prove that the government's evidence was tainted by use of his bankruptcy testimony. However, the record shows that the court first required the government to prove by affidavits and testimony that no government attorneys or personnel connected with them in this case had seen, read or used Block's bankruptcy testimony, directly or indirectly, before denying the motion to suppress.

**15.** This statutory grant of "use plus derivative use" immunity is coextensive with the Fifth Amendment privilege against self-incrimination. *Kastigar v. United States,* 406 U.S. 441, 462, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). *See Goldberg v. Weiner,* 480 F.2d 1067, 1070 (9th Cir. 1972).

**16.** In Part K we discuss an aspect of the proceeding before the SEC. Block testified before the SEC on May 21, 22, and 30, 1973, and on September 24, 1973. He first testified in his bankruptcy case on December 11, 1973.

■ We have reviewed the pertinent portions of the record in this appeal, and agree with the district court that the government met its burden under *Kastigar*. The court properly denied Block's motion to suppress.

## M. PROPRIETY OF PROTECTIVE ORDER ISSUED IN BANKRUPTCY PROCEEDINGS

While Block's bankruptcy was in progress during the pendency of this criminal case in the district court, Equity Funding was also undergoing Chapter X bankruptcy proceedings in the same district court. Block's bankruptcy was before Bankruptcy Judge Russell Seymour, and Equity Funding's bankruptcy was before Bankruptcy Judge James Moriarty.

Block obtained bankruptcy subpoenas from Judge Seymour under Rule 205, Rules of Bankruptcy, to examine 61 witnesses. Block's acknowledged purpose in obtaining those subpoenas was to prepare for his criminal trial. Because two of those witnesses were located in Washington, D.C., Block initiated an ancillary proceeding in the bankruptcy court of that federal district pursuant to order of Judge Seymour, and subpoenas were issued there. Meanwhile, the trustee in reorganization for Equity Funding filed an application for a protective order to prevent the examination of the two District of Columbia witnesses, who had been lawyers for Equity Funding in connection with SEC matters. The trustee's reason (among others) was that examination of those witnesses would unduly disrupt the reorganization proceedings. On recommendation of Judge Moriarty, the district court issued the protective order enjoining the enforcement of the District of Columbia Bankruptcy subpoenas.

Block contends that the protective order deprived him of his right to prepare adequately for trial and his right to effective assistance of counsel. The district judge characterized this argument as frivolous.

Bankruptcy Rule 205(d) provides: "The examination under subdivisions (a) and (b) of the rule may relate only to the acts, conduct, or property of the bankrupt, or to any matter which may affect the administration of the bankrupt's estate, or to his right to discharge." The rule pertains to preparation for bankruptcy proceedings only—not to preparation for defense of a criminal action, which was Block's avowed purpose.

■ The protective order did not purport to limit any right Block had under Fed.R.Crim.P. 15, 16, and 17 to use subpoenas, have discovery, and take depositions in connection with his criminal trial. We agree with the district judge that Block's contention is frivolous.

## N. PROPRIETY OF CERTAIN COUNTS ON WHICH APPELLANTS WERE CONVICTED

Lichtig contends that, as a matter of law, he could not have been convicted on Counts 6 and 10 through 14 because these six counts reallege by reference portions of Counts 1 and 2, which were dismissed before the case was submitted to the jury.[17] Block and Weiner adopt this argument as to the relevant counts on which each of them was convicted.

Count 1 charged Lichtig, Weiner, Block, and nineteen others with conspiracy to commit securities fraud by mail, in violation of 18 U.S.C. § 371. Count 2 charged all twenty-two defendants with securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x. Count 2 incorporated by reference certain informational paragraphs of Count 1. The six counts each consisted of two paragraphs, the first of which incorporated by reference all the allegations of Count 2 (except the last paragraph of Count 2, which pertained only to defendant Evans), and the second paragraph of which related a particular transaction wherein certain defendants, other than Lichtig, Weiner, and

---

17. The trial judge was careful to summarize the charges in the six counts for the jury, including the portions of Counts 1 and 2 which were incorporated by reference, and to admonish the jury to consider only the counts submitted to it and not the counts which had been dismissed.

Block, used the mails. From these facts, Lichtig argues, reversal is required on the six counts because the first paragraph of each count merely realleges Counts 1 and 2, which no longer exist, and the second paragraph does not even refer to him.

■ Lichtig overlooks the following: (1) Fed.R.Crim.P. 7(c)(1), which provides, "Allegations made in one count may be incorporated by reference in another count"; (2) settled law that the dismissal of one count of an indictment which is referred to in the remaining counts does not vitiate the remaining counts where, as here, the reference is sufficiently full to incorporate the matter from the dismissed count (*Crain v. United States,* 162 U.S. 625, 633, 16 S.Ct. 952, 40 L.Ed. 1097 (1896); *United States v. Shavin,* 287 F.2d 647, 650 (7th Cir. 1961); *Barnard v. United States,* 16 F.2d 451, 453 (9th Cir. 1926)); (3) settled law that one of several defendants may be charged with and convicted of a substantive offense when, as here, the evidence shows that he joined the conspiracy and that the substantive offense was committed in furtherance of the conspiracy, even if that defendant did not do and was not specifically aware of all the acts constituting the offense (*Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *see also United States v. Iannelli,* 461 F.2d 483, 486 (2d Cir. 1972); *United States v. Roselli,* 432 F.2d 879, 894–95 (9th Cir. 1970)).

O. SUFFICIENCY OF THE EVIDENCE

■ Defendants contend that there was insufficient evidence to sustain their convictions. In our review we must take the

evidence in "the light most favorable to the verdict." *United States v. Nelson,* 419 F.2d 1237, 1241 (9th Cir. 1969); *Glasser v. United States,* 315 U.S. at 80, 62 S.Ct. 457; *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), cert. denied, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974).

■ Weiner was convicted of ten counts, Lichtig of thirteen, and Block of seven. Each defendant was sentenced to concurrent sentences on all counts. We need only find evidence sufficient to support conviction on one count for each defendant in order to sustain the verdicts under the concurrent-sentence doctrine. *United States v. Valdovinos,* 558 F.2d 531, 534 (9th Cir. 1977); *United States v. Monroe,* 552 F.2d 860, 865 (9th Cir. 1977); *United States v. Rodriguez,* 546 F.2d 302, 308 (9th Cir. 1976). We will, however, consider more than one count as to each defendant, because of the nature and complexity of the case.

The counts under consideration may be divided into two groups. Counts 75, 78, 80, and 84 allege that one or more of the defendants "willfully made or caused to be made untrue statements of material fact" in various registration statements filed with the Securities and Exchange Commission. The allegedly false statements were that the firm of Wolfson, Weiner, Ratoff and Lapin [18] had audited the financial statements of Equity Funding and its subsidiaries using generally accepted auditing standards (GAAS) and had found them to be in conformity with generally accepted accounting principles (GAAP).[19]

18. The accounting firm of which all three defendants were a part was originally called Wolfson and Weiner. It expanded to Wolfson, Weiner, Ratoff and Lapin, and then merged with Seidman and Seidman in 1971.

19. The relevant portion of the text which appears in each of these counts is as follows:

"* * * [T]he firm of Wolfson, Weiner, Ratoff and Lapin (Seidman and Seidman), certified public accountants, had examined the consolidated statements of financial condition of EFCA and its subsidiaries as of December 31, 1968 (1969–1971), and the related consolidated statements of earnings and retained earnings and the consolidated statements of additional paid-in capital for the five years then ended, in accordance with generally accepted auditing standards, and that, in the opinion of Wolfson, Weiner, Ratoff and Lapin (Seidman and Seidman), the aforesaid financial statements presented fairly the consolidated financial position of EFCA and its subsidiaries as of December 31, 1968 (1969–1971), and the consolidated results of operations for the five years then ended, in conformity with generally accepted accounting principles applied on a consistent basis."

The second group, Counts 76, 77, 79, 81, 82, and 83 charge Lichtig, and others not tried here, with willfully making and causing to be made untrue or false and misleading statements of material fact or willfully omitting or causing to be omitted statements of material fact about specific accounts contained in the financial statements included in the registration statements filed with the SEC. These counts deal with errors in the actual amounts reported.

These two groups of counts were treated together by the judge as the "false filing charges." In his instructions to the jury he stated the three necessary elements that the prosecution must establish in order to warrant a conviction:

"The first element is that the defendant under consideration in the specific document named in the count made or caused to be made a false statement of material fact, or, where alleged, omitted or caused to be omitted a material fact required to be stated therein or necessary to make the statements therein not misleading.

"Counts 76, 77, 79 and 81 allege both false statements and omissions to make certain disclosures. The other counts allege only false statements.

"The second element is that the document named in each respective count has been filed with one or more of the bodies named in the count.

"The third element is that the defendant under consideration acted wilfully and, with respect to Counts 82, 83 and 84 that he additionally acted knowingly."

As previously stated, it is undisputed that the financial statements of Equity Funding failed to reflect the actual condition of the company. Thus, the first element is satisfied because the financial statements contained false statements of accounts. The connection of the defendants with the statements was shown by their individual responsibilities in relation to the audits. Each had a managerial role and had responsibilities for the overall audit and the final reports. Lichtig's connection, when he was an officer of Equity Funding, was shown by his signature on each registration statement as the Executive Vice President with financial responsibilities. The second element is also easily shown, as each document in question bears proof on its face of filing with the SEC.

■ The remaining inquiry is whether defendants approved of and concurred in the grossly misstated reports in the good faith belief that the statements were accurate representations or whether they knowingly and willfully acquiesced in the dissemination of false statements. *See United States v. Colasurdo,* 453 F.2d 585, 594 (2d Cir. 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); *United States v. Simon,* 425 F.2d 796 (2d Cir. 1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). In our discussion of intent in *United States v. Kaplan,* 554 F.2d 958 (9th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), we stated:

"Credibility was for the jury. The jury had to resolve evidentiary conflicts and draw reasonable inferences therefrom. * * * An inference of criminal intent can be drawn from circumstantial evidence. * * *" 554 F.2d at 964. (Citations omitted.)

As we discuss below, there was sufficient evidence from which the jury could find that defendants willfully and knowingly produced the documents containing erroneous information.

1. *Sufficiency—An Overview*

Each group of counts charged similar acts in different years. An erroneously recorded transaction in one year often persisted into the following years. Our count-by-count analysis is chronological, but in order to understand the full impact of particular actions a general examination is helpful.

Equity Funding's unorthodox bookkeeping began in the early sixties. Evidence of the manipulation before 1968 was presented to the jury. By 1968 a pattern had emerged in which the Funded Loans and Accounts Receivable asset account (FLAR)

was being used as an umbrella account for numerous and varying false entries. Other accounts, both assets and liabilities, were inflated or created as needed to present the desired picture of a healthy, growing corporation. Weiner and Lichtig had audited the company since the early sixties. After Lichtig became Equity Funding's Executive Vice President, Block became the audit manager. They were thus involved with the company's financial history almost from its inception. Weiner and Lichtig also helped engineer many of the "innovative" accounting techniques utilized over the years.

Various Equity Funding officials testified to the falsity of the figures that appeared on the financial statements and to the fact that in many instances no backup papers supported the entries. Therefore, if the auditors had attempted to confirm the information given to them they would have been unable to do so. The lack of backup and supporting schedules would have been a clear indication that something was wrong. Since such backup often was not even fabricated, the jury could infer that the auditors either completely failed to audit the areas, in disregard of GAAS, or consciously failed to audit in "cooperation" with the Equity Funding officials, thus purposely avoiding the false entries. If the questionable areas had been audited and no backup found, the failure of the auditors to reflect that fact in their report would have clearly contravened GAAS and the purpose of an independent audit.

After the fraud was discovered in 1973, Touche, Ross & Co. was appointed to audit the financial statements of Equity Funding in accordance with GAAS and GAAP. Touche, Ross & Co. made substantial adjustments after finding it impossible to confirm properly many of the recorded transactions or upon finding that mathematical calculations were erroneous. Many of the adjustments related to transactions that occurred years before. The total final adjustment to the FLAR account alone was a deduction of $62,305,353 to eliminate the items related to false or improper entries. The remaining valid balance was approximately $44,000,000.

The testimony of William Simpson, an SEC accountant, further supported the findings of the auditors from Touche, Ross & Co., as did the testimony of the Equity Funding employees regarding the development of nonexistent assets. The sheer magnitude of the adjustment, and the length of time over which Weiner, Lichtig, and Block were involved with the company, warrants at first consideration a strong inference that the defendant auditors either were totally inept or, more likely, were at least partly aware of the false inflation of Equity Funding's accounts. Our discussion of the FLAR and other accounts in the financial statement for 1968 through 1971 will detail the particular treatment of several items later found to be false.

### 2. The Audits

#### a. 1968

At the beginning of the 1968 audit, Jerome Evans, Treasurer of Equity Funding, disappeared. The company's books also vanished. John Templeton was appointed controller and, with the cooperation of Equity Funding employees and the auditors, attempted a reconstruction of the books. Starting from the unaudited third-quarter statement, they developed a yearly statement. The FLAR account showed a balance of $36,311,037. The opposite liabilities account, Notes Payable and Funded Loans and Accounts Receivable, totaled $15,564,629.29. The Consolidated Statement of Financial Condition that appeared in registration statements filed with the SEC on April 22, 1969, and December 31, 1969, contained these figures.

Count 75 of the indictment alleges that defendants Weiner and Lichtig "willfully made and caused to be made untrue statements of material fact" in the April registration statement which stated that an independent audit of the financial statement using GAAS had found it to reflect truthfully the financial condition of the company and its operations and to have been prepared according to GAAP.

Count 76 charges that Lichtig and another defendant "wilfully made and caused to be made untrue statements of material fact" or "wilfully omitted and caused to be omitted statements of material fact" in the December registration statement. The untrue statements were in the Accountant's Report submitted to the SEC with the registration statement. The untrue facts and omissions were the erroneous reporting of various specific accounts contained in the financial statement and incomplete descriptions of certain accounts.

There is no question about the inaccuracy of the figures contained in the financial statements. The necessary determination is whether there was sufficient evidence to support the jury's verdict and the underlying finding that defendants had acted wilfully and with knowledge in filing the incorrect financial data and certifying its reliability.

The FLAR and Notes Payable Accounts contain references to footnote 4 in the Notes to the Consolidated Financial Statement,[20] which states:

"Under the method of operations of the company, this represents, in the aggregate, the amount that clients owe as a result of the various 'funding programs' offered by the company, together with loans and/or receivables where 'funding programs' have terminated and where the respective shares have not been liquidated as of December 31, 1968.

"The Funded Loans and Accounts Receivable are offset, in part, by the Contra Notes Payable in Funded Loans and Accounts Receivable. The difference, in the amount of $20,746,408 is held by Equity Funding Corporation of America or one of its subsidiaries."

Contrary to the footnote, the FLAR was not composed only of sums related to the funding programs. Templeton had been unable to support the estimated figure for the FLAR with detail from funding pro-

grams in his original work and had been told that the discrepancy was due to the fact· that $13,500,000 included in the account represented reciprocal commissions (recip).[21]

At Templeton's insistence, Weiner and Lichtig were informed of the inclusion of "recip" in the FLAR account. They were told it was necessary to place the item in the account because problems could arise if there were an open reporting of the funds. Lichtig and Weiner agreed to the inclusion of the amount without any confirmation.

The inclusion of the "recip" in the FLAR account was misleading. The footnote for the account contains no indication that it represents any money other than that related to the various funding programs. There is a material difference in representing that the $13,500,000 was a receivable resulting from the sale of the product the company offered rather than a one-time collection of monies due.

A second error in the FLAR balance demonstrated that the independent auditors failed properly to check the company's financial statements. Templeton testified that he had determined that the "collateral held by EFCA" on funded loans that had terminated was worth $6,672,337. He arrived at the figure by looking at approximately 390 funding programs and finding that seven for which Equity Funding still held the collateral had terminated. He computed this as a termination rate of 18 percent, and multiplied that figure by the estimated total collateral held by Equity Funding to reach the $6 million figure. In fact, the percentage was properly 1.8 percent, and the figure should have been only $667,233.70. William Simpson testified that the workpapers contained a notation next to the inflated figure: "To be revised." In parentheses on another sheet, the lower percentage had been used to arrive at the correct, lower figure. The revision was never included in the final trial balance or the completed financial statements.

---

20. The proper footnote is footnote 3.

21. "Reciprocal commissions" is the term used for the portion of commissions earned by vari- ous brokerage houses on securities transactions involving Equity Funding that was returned to Equity Funding.

Other evidence tending to show the lack of application of GAAS and GAAP included the fact that the footnote showed no figure for the total amount of collateral supposedly held by Equity Funding for the funded loans. Auditors examining the records after discovery of the fraud found no confirmation of the internally held programs or their collateral. Other mathematical duplications in various accounts went uncorrected. Detail work for the portion of the FLAR arising out of the actual programs was not fully confirmed.

Thus, in 1968 the FLAR was riddled with mathematical errors, incorrectly described in the relevant footnote, and contained items that were not and often could not be confirmed. Weiner was the managing partner for the audit, and Lichtig was the field manager. Templeton testified that Lichtig had informed him that the inclusion of "recip" in the FLAR account was acceptable, and there would be no confirmation. Lichtig was in constant contact with Templeton and was aware of Templeton's frequent questions about various procedures. He was also responsible for reviewing the workpapers of the auditors working below him. Templeton testified that Lichtig told him he would not confirm the accounts receivable, and that Lichtig refused to permit Templeton to see the audit workpapers from previous years to aid in the reconstruction of the records. Finally, Lichtig was responsible for the note describing the FLAR and Contra Notes Payable accounts.

There was clearly sufficient evidence to support the jury's conviction of Lichtig on Count 75. Since Count 76 dealt with a registration statement containing the same financial statement, that conviction was also supported by the evidence. Lichtig had become an officer of Equity Funding by the time of the filing of the second statement, and his signature appears at the end of the statement in his official capacity. As an auditor he had known about the falsehoods in the financial statement, and as an officer of the corporation he continued to misrepresent the fact that the statement did not accurately reflect Equity Funding's financial status.

The evidence as to Weiner is not as clear as to Count 75. The major relevant testimony is Templeton's description of Lichtig's representations regarding "recip" after the meeting with Weiner and Goldblum. Were this the only evidence and the only count against Weiner, his conviction might be difficult to sustain. In light of the testimony regarding his participation in later years, his position of responsibility, and the enormity of the misstatements, however, it was possible for the jury to infer his knowing and willful participation in the preparation of the false statements. In any event, we need not consider the question further because there is ample evidence to sustain his conviction under other counts.

b. 1969

Counts 77 and 82 repeat the basic allegation contained in Count 76, and Count 78 repeats the basic allegation contained in Count 75. Counts 77 and 82 relate to a registration statement filed with the SEC on December 9, 1970; Count 78 relates to one filed on August 20, 1970. Lichtig is charged in Counts 77 and 82 with making or causing to be made untrue statements about accounts listed in the financial statements contained in the registration statements, and Weiner and Block are charged with making or causing to be made untrue statements or omitting material facts in the accountants' report in Count 78. Weiner and Lichtig were convicted on these counts; Block was not.

Each registration statement contained an audited Consolidated Statement of Financial Condition as of December 31, 1969. The "Report of Independent Certified Public Accountants" signed by Wolfson, Weiner, Ratoff and Lapin, and included with the financial statements, represents that an independent audit had been made, that the examination was "made in accordance with generally accepted auditing standards," and that the financial statement was in conformity with GAAP.

The FLAR account is recorded at $51,188,199, up almost $15 million from the year

before. Contra Notes Payable equaled $21,-703,967, and Note 4, the referenced footnote, states that the difference of $29,484,-151 is held by Equity Funding and its subsidiaries. The note essentially duplicates that written for the 1968 statement, except for the figures and the insertion of the words "and net contracts receivable" in the first paragraph.[22]

Sultan testified that the first trial balance during the audit for 1969 had a FLAR balance of $33 million, which was too low. After discussions with others in the company it was decided that other assets would be added to the FLAR account and the detail would be padded on the basic funded loans asset.

The Investors Planning acquisition previously discussed took place in 1969, and the creation of the Client Contractual Receivable Account significantly increased the FLAR balance. The final amount booked in the Clients Contractual Receivable Account in which the Investors Planning manipulations were reflected was $17,874,-290, with commissions payable of $4,638,473 for a total of around $13 million in income recorded. According to West, the CPA from Wolfson, Weiner, Ratoff and Lapin who worked on the audits from 1969 through 1972, a final adjustment of $1,500,-000 was made in the account after Block indicated that the company needed more income.

Norman Grosman, a partner in Touche, Ross & Co., testified that the accounting treatment of the trail commissions was contrary to GAAP. Normally, when a company makes an acquisition the assigned value cannot exceed the purchase price. The purchase price here was $10 million, but an additional $17 million value was assigned to the trail commissions. The value of the $10 million acquisition was thus inflated in the

financial statement to approximately $27,-800,000. It was also contrary to GAAP to accrue these commissions in the year of purchase and to record excess value.[23]

Once the establishment of the Clients Contractual Account had been agreed to, Goldblum promised to write a letter to Weiner guaranteeing the purchase of the commissions should the planned sale not go through. Block then wrote a footnote to the financial statement accurately describing the transaction. Lowell testified that he, Weiner, and Goldblum found the footnote totally unacceptable. With Weiner's participation, they compromised on inserting the phrase "and net contracts receivable." It was inserted in the middle of an unrelated sequence in order to avoid arousing interest. According to Lowell, Weiner was aware that if Block's footnote had been used the company would have shown a *decrease* in earnings, while the use of the compromise footnote and the addition of the Clients Contractual Receivable to the FLAR account created an increase.

A deliberate arithmetical error was introduced to the final detail information on the funded loans asset to increase its paper value. Lowell met with Weiner and told him that if he did not have the detail added up, the company could take care of the shortfall. This was done by inserting a $2 million "plug," which appeared in the total but not in the detail lists. Lowell showed the computer card containing the "plug" to Lichtig. Lloyd Edens, former director of financial services of Equity Funding and Treasurer of Equity Funding Life, in his testimony, confirmed the use of the device.

Fred Levin, Executive Vice President of Equity Funding and President of the life insurance subsidiary, Equity Funding Life Insurance Company (Equity Funding Life),

---

22. The revised portion of the note, with the addition underlined, reads:

"Under the Company's method of operations, this represents, in the aggregate, the amount that clients owe as a result of the various 'Equity Funding Programs' offered by the Company, *and net contracts receivable* together with loan and/or receivables

where 'Equity Funding Programs' have terminated."

23. Referring to our earlier discussion of the transaction, we note that the valuation placed on the Clients Contractual Accounts and the creation of the account were concurred in by Weiner, who participated in developing the accounting treatment.

confirmed that meetings had taken place between Weiner and Lowell regarding the treatment of the Investors Planning commissions. West testified that he and other coworkers on the audit had questioned Block about the recording of the Client Contractual Account on the 1969 audit because they felt it was an unorthodox treatment. Block told them he would discuss it with Weiner, and later said that on Weiner's direction it would be allowed to stand.

There was ample evidence to show Weiner's knowledge of the improper handling of the FLAR account. The modified footnote that he helped draft concealed the true condition and operations of the company. According to Lowell, Weiner was aware of the misleading effect of the presentation used. In addition, Grosman and others testified about the failure to adhere to GAAP and GAAS. This evidence, and evidence of failures to confirm major assets claimed or to check the information supplied by the company, supports the jury's finding that Weiner knowingly and willfully made or caused to be made false and misleading statements in the auditor's report. Weiner's position as managing partner and his active participation in developing ways of presenting only advantageous descriptions of the company's financial condition also support his conviction on Count 78.

Lichtig's involvement was shown in a number of ways. He was originally in charge of presenting the figures to the auditors in the beginning of 1969.[24] He was a participant in meetings with Goldblum, Weiner, and Lowell where the accounting treatment of the trail commissions was determined. He was shown the card with the "plug." His signature appears on the SEC statement as Executive Vice President and Treasurer. He knew of the inflation in the FLAR account from previous years. This and other evidence demonstrated his general knowledge of the purposeful false inflation of FLAR and other accounts on the financial statement. The jury had sufficient evidence to convict him on Counts 77 and 82.

### c. 1970 and 1971

Count 79 charges Lichtig with acts similar to those charged in Count 76 with regard to a registration statement filed with the SEC on December 7, 1971. Count 80 charges Weiner and Block with the same violation as charged in Count 75 with regard to the 1971 registration statement, which contained the audited statements for 1970. All three defendants were convicted.

In 1970, the Investors Planning trail commission sale was made. There was no confirmation of the sale in the workpapers, and West testified he saw no attempts to verify the collectibility of the balance of the receivable after the initial down payment by checking on the purchaser's financial condition. There was testimony that this was contrary to GAAS. Other significant events in 1970 included the discovery of a $10 million plug in the total for the Funded Loans Receivable asset. Edens testified that he had helped manufacture the plug by running a special total sheet that was given to the auditors. The plug was found when West added a few sample pages of the detail, multiplied it by the total number of pages, and found the result greatly inadequate. Lichtig alerted Lowell to the problem, and a meeting was held among Lowell, Lichtig, Edens, and another Equity Funding employee, Bill Mercudo. Edens was directed to prepare a reconciliation, which he then gave to Block. Edens testified that he manufactured backup for the information given to Block, and that a check of the schedules supplied would have revealed the falsity of the claimed assets.

The general ledger contained many entries that showed simultaneous increases and transfers in round numbers in accounts that normally are unrelated. Grosman, Benjamin Karchin, an SEC examiner, and West all confirmed the impropriety of the entries. Block never questioned the methodology underlying the entries, and there was no evidence found in the workpapers

---

**24.** He made an error that Goldblum feared would invite close scrutiny of the financial statements; and was then replaced in this role by Lowell.

that any checks on the various transfers and inflations had taken place. Sultan testified that the entries were purely fictitious and no backup or schedules supporting them had been prepared.

Block was also specifically aware of the reclassification of Selling, General, and Administrative costs into Commission expenses. The two accounts were unrelated, so the reclassification was suspicious on its face. Block did not follow up on the reclassification to determine the justification for it. The change was in fact an improper manipulation of the accounts. Block also never questioned the inclusion of exploration costs on the books of Equity Funding. Such costs normally would be reflected on the books of the company actually doing the exploration, i. e., the appropriate subsidiary, rather than on the books of the parent corporation.

Lowell testified that in 1971, during the course of the 1970 audit, Block told him that he knew about "recip."[25] The statement came up during a conversation about notes receivable. The notes did not exist as a true receivable, but supposedly represented a collection of "recip" that Equity Funding did not want to reveal. Block asked for confirmation, and a confirmation was arranged through someone in Italy. Weiner directed Lowell to get confirmation for Block, despite Lowell's protests. This was only one of several times that Lowell had confirmations manufactured at Weiner's request. Block indicated knowledge of the questionable nature of some of these false confirmations when he pointed out to Lowell that envelopes bearing the confirmations had unlikely postmarks.

Lowell testified that Block had questioned some of the procedures during the first part of the audit. Lowell, with the concurrence of other participants in the scheme, offered Block a trip to Rome if he would cooperate. After this conversation, the reconciliation to explain the $10 million gap in the funded loans asset was given to Block, and he was told to handle it himself. No further questions were raised by him about the asset, and, as stated, apparently no inquiry into backup was made. Block's suspicions were aroused in 1969. The jury chose not to convict him for his activities then. Their finding that by 1971, during the audit for 1970, Block had the requisite willfulness and knowledge is supported by the record. Although he may not have known the magnitude of the fraud or many of its details, his awareness of the manipulations used and his willingness to cooperate and not fully investigate suspicious areas suffice to sustain his conviction on Count 80.

During the 1970 audit Weiner knew that two confirmations, one for an account at Banco Union and another for Banque Jordan, were prepared at Lowell's direction. Weiner received one by mail and one from Lowell personally. At the least, he knew that the explanation for the accounts was that they concealed "recip" income, and he nonetheless cooperated in falsifying the confirmations. The confirmations showed the accounts to be cash deposits subject to withdrawal by check with no interest shown as payable. This was never questioned even though the accounts were listed as investment accounts in the financial statements. Weiner also knew that certain notes receivable were not what they purported to be. During the 1970 audit he participated in developing a coverup of a mistake made in the 1969 recording of an investment. The account was reclassified with Weiner's knowledge, and a note was attached to the journal entries dealing with the reclassification which stated: "All transactions verified by JW—WWR & L—no adjustments necessary." Lowell prepared the schedule and note and sent a copy to Weiner and Block. Weiner's continuing involvement with various misleading practices was sufficiently proved to sustain his conviction on Count 80.

25. Because covering up the receipt of "recip" was one of the reasons given for many questionable recording practices, the jury could logically infer that Block's statement showed knowledge of at least some of these practices.

Lichtig participated in the discussions of how to cover up the $10 million plug discovered by West. His continued role as an officer of Equity Funding involved in its financial affairs, combined with his previous knowledge of the falsification in the account, supplied sufficient evidence to sustain his conviction on Count 79.

Counts 81 and 93, charging Lichtig, and 84, charging Block and Weiner, are the same counts for the 1971 audit based on SEC registration statements filed on September 8, 1972, and April 5, 1972, which contained audited financial statements for the year 1971. The involvement of each defendant was continuing. They each held the same position as in the years before. Block's further knowledge of the falsity of the financial statements was demonstrated by events such as a conversation with Lowell in the summer of 1971 wherein he described, hypothetically, a transaction exactly like that which had been set up for the purported sale of the Investors Planning Client Contractual receivable. He also made requests to Lowell and Goldblum for a job with Equity Funding, thus bringing his independence sharply into question. Sultan testified that the earnings-per-share figure released in a press release turned out to be a penny off, and that he had discussed the problem with Block. Sultan changed the figures showing the number of outstanding shares, and Block was aware that the change to an erroneous figure was made.

In general, inflations of accounts continued in 1971, and earlier incorrect figures were carried forward even though in some instances there was a *prima facie* indication that something was wrong with the accounts. In one instance an account that would not normally have been static had the same beginning and ending balance, and there was no investigation to determine the reason for such an unusual situation. Also, no payment was received on various notes receivable; yet the notes were not discounted or written off but were carried at full value. Thus, sufficient evidence existed to support defendants' convictions on each of the applicable counts for the audits for the years 1970 and 1971.

In view of the sufficiency of the evidence on the foregoing counts, the concurrent sentence doctrine makes it unnecessary to review in detail the evidence on Counts 6 and 10 through 14.

*Summation.*

Defendants have contended that they were victims of the fraud perpetrated by the officers of Equity Funding, and that, although they might have been to some degree negligent or they might have erred in their judgment as auditors, their criminal participation was not proved. More accurate is the following comment of the trial judge made during the proceedings relating to defendant's motion for new trial:

"The evidence, I think, does not show that the defendants were aware of the fraud in its early stages. I think they were the victims of the fraud for some period of time. * * * Even though the evidence is not altogether direct, it is largely circumstantial, it is overwhelming to the point where I cannot escape the conclusion that the defendants must have known and must have come to a point where they knew of the fraud, and that they thereafter did acts in furtherance of the fraud."

The Equity Funding account was a large part of the business of Wolfson, Weiner, Ratoff and Lapin. Weiner and Lichtig had worked with Equity Funding almost from its inception. Weiner's participation in financial decision-making at critical stages was established. Lichtig moved into an executive position. By 1971, Block was also attempting to gain employment with Equity Funding. There is no question that a purposeful fraud was perpetrated by the officers of Equity Funding. The overwhelming scope of the fraud, its often complex but sometimes very simple mechanisms, and the failure of the auditors to find in any of the suspicious procedures cause to dig further into Equity Funding's financial records system all lead to the inescapable conclusion that defendants were in-

volved. Even if they did not initially know or indeed learn the step-by-step fictitious entries and improper manipulations, their consistent failure to apply GAAS and GAAP after they knew some kind of a major fraud was afoot provided a basis from which the jury could reasonably infer defendants' knowing and willful participation in the fraud.

"\* \* \* Generally accepted accounting principles instruct an accountant what to do in the usual case where he has no reason to doubt that the affairs of the corporation are being honestly conducted. Once he has reason to believe that this basic assumption is false, an entirely different situation confronts him. \* \* \*." *United States v. Simon*, 425 F.2d at 806.

## P. JURY INSTRUCTIONS DEALING WITH INTENT

We next dispose of defendants' contentions regarding certain jury instructions: those related to the question of the sufficiency of the evidence.

### 1. *Compliance with GAAS and GAAP*

Defendants first challenge the court's instruction on the rule of generally accepted auditing standards and generally accepted accounting principles in the jury's delibera-

tions. The instruction is reproduced in the margin.[26]

We have not previously ruled on the propriety of instructions which state that compliance or noncompliance with GAAS or GAAP is relevant to the determination of a defendant's intent. The Second Circuit has dealt with similar instructions in *United States v. Simon*, 425 F.2d 796 (2d Cir. 1969), and *United States v. Natelli*, 527 F.2d 311, 318–24 (2d Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). In *Simon* three accountants appealed from their convictions on three counts arising out of their drawing up and certifying a misleading and false financial statement. The jury was instructed that the primary determination was whether the financial statements accurately reflected the company's condition, and, if not, whether the defendants acted in good faith. Proof of compliance with GAAS was deemed "evidence which may be very persuasive but not necessarily conclusive that he acted in good faith." 425 F.2d at 805. *See United States v. Natelli*, 527 F.2d at 318–24; *United States v. Colasurdo*, 453 F.2d at 594.

■ The prosecution introduced into evidence the Statement on Auditing Standards (1973) issued by the Committee on

26. The instruction reads, in pertinent part:

"One circumstance you are entitled to consider and weigh in determining whether the defendants Weiner, Lichtig, and Block acted willfully and knowingly while in their capacities as independent accountants in relation to Equity Funding is whether they followed or deviated from generally accepted auditing standards or accounting principles in effect at the times here pertinent.

"For example, in this case you may recall evidence of certain accounting principles or auditing standards which were talked about.

"The government points to evidence which they say establishes that, at various times each of the defendants deviated from sound accounting principles and auditing standards.

"Evidence on this issue is not conclusive, however, on the overriding issue of the defendant's [sic] knowledge and intent. The weight and credibility to be extended by you to such proof must depend among other things, on the weight you give to the opinion evidence offered by the Governments' [sic] witnesses.

"Generally, when a certified public accountant is engaged to perform an independent audit for a corporation such as Equity Funding, he represents and warrants that he will perform the audit and other accounting work in accordance with generally accepted auditing standards and generally accepted accounting principles and that he will render an opinion as to whether the financial statement of the company fairly represents its financial position and the results of its business operation.

"Proof, if any, that any of these defendants departed from such standards of auditing and accounting as were then applicable or participated in the preparation or approval of an audited financial statement that did not fairly present Equity Funding's financial position is evidence, though not necessarily conclusive evidence, that the individual defendant involved did not act honestly or in good faith, and that the financial statement prepared contrary to such standards may have been materially false or misleading."

Auditing Procedure, American Institute of Certified Public Accountants. The Statement outlines the general purpose of the independent audit,[27] and § 110.05 explains the responsibilities of the individual auditor who finds fraud in the entity whose records are being examined:

"In making the ordinary examination, the independent auditor is aware of the possibility that fraud may exist * *. However, the ordinary examination directed to the expression of an opinion on financial statements is not primarily or specifically designed and cannot be relied upon, to disclose defalcation and other similar irregularities, although their discovery may result * * *. The responsibility of the independent auditor for failure to detect fraud (which responsibility differs .as to clients and others) arises only when such failure clearly results from failure to comply with generally accepted auditing standards."

Under these standards the auditor is not "responsible" for fraud that has gone undetected despite his utilization of generally accepted auditing standards. In our case, failure to apply generally accepted auditing standards is relevant to the issue of knowledge and willfulness.

■ Sufficient evidence was introduced to raise the issue of conformity with GAAS and GAAP. During the trial several witnesses testified that many of the practices under consideration were not in conformance with GAAS and GAAP. Generally, no audit manual was prepared for each year's audit, no checks on internal controls were made, and basic standards for confirming accounts were not followed. The witnesses included Norman Grosman, a partner in Touche, Ross & Co.; Frank West, who worked on the audits from 1969 through 1972; and William Simpson and Benjamin Karchin, SEC employees who reviewed Equity Funding's books. The jury had evidence from which it could determine whether GAAS and GAAP were properly utilized and whether the failure to utilize them was such as to lead to a reasonable inference of criminal intent.

The judge's instruction, which stated that evidence regarding compliance with GAAS and GAAP was not conclusive but was relevant, was a proper statement. The weight to be given the evidence was for the jury's determination.

### 2. "Willfulness"

Defendants also assert that the court erred in instructing the jury on the issue of knowledge. The jury was instructed that proof of negligence was insufficient to support a conviction, and that proof of good faith constituted a complete defense to the charges. The court went on to instruct the jury that, in determining intent, the jury could consider whether defendants acted in "reckless, deliberate indifference to or disregard for truth or falsity," and could infer from proof of such acts that defendants acted willfully and knowingly.[28]

---

27. "The objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his examination has been made in accordance with generally accepted auditing standards." Committee on Auditing Procedure, American Institute of Certified Public Accountants, Statement on Auditing Standards § 110.01 (1973).

28. The instruction reads, in pertinent part:
"It is not enough, of course, merely to establish that a given defendant acted negligently or through error or mistake. Under our system of laws men are not punished criminally for mere mistakes in judgment, mismanagement, carelessness, negligence, or errors of judgment. They are punished only for intentional wrongdoing. The defendants are not on trial here for errors of judgment or mistakes or mismanagement or negligence, but are on trial for a criminal offense, and an essential element of that offense is an evil or criminal intent, which it is incumbent upon the government to prove to your satisfaction and beyond a reasonable doubt before you will be warranted in returning a verdict of guilty.
"The defendants argue that they acted in good faith in their activities relating to Equity Funding. Good faith, that is to say, an honest belief in the truth of the statement made, would constitute a complete defense here.

The instruction was given before our decision in *United States v. Jewell*, 532 F.2d 697 (9th Cir.) (en banc), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), where we held:

> " * * * To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, 'positive' knowledge is not required." 532 F.2d at 700.

*See United States v. Valle-Valdez*, 554 F.2d 911, 913–14 (9th Cir. 1977). The trial court's instruction in the present case followed closely the instruction approved by the Second Circuit in *United States v. Natelli*, 527 F.2d at 322–23. There the trial court had instructed the jury that, on proof of "reckless deliberate indifference to or disregard for truth or falsity," the jury could infer the defendants' willful and knowing participation in the filing of false financial information with the SEC. The defendants contended that the instruction erroneously failed to state also that there must be a concurrent, "conscious purpose to avoid learning the truth." 527 F.2d at 323. The court approved the instruction and stated:

> " * * * The dual instruction is not necessarily required, however, when the defendant is under a specific duty to discover the true facts, the facts tendered are suspect, and he does nothing to correct them." 527 F.2d at 323.

The court properly instructed the jury on the need to find both deliberate avoidance and an awareness of impropriety. Defendants here, as auditors, had a duty carefully to investigate and review the information presented. Because the instruction stated that good faith constituted a complete defense, it was implicit in the instruction that, coupled with a finding of deliberate avoidance of knowledge, the jury also had to find bad faith.

As the Second Circuit stated in *United States v. Simon*:

> " * * * '[W]hile there is no allowable inference of knowledge from the mere fact of falsity, there are many cases where from the actor's special situation and continuity of conduct an inference that he did know the untruth of what he said or wrote may legitimately be drawn.' * * * Evidence that defendants knowingly suppressed one fact permitted, although it surely did not compel, an inference that their suppression of another was likewise knowing and willful." 425 F.2d at 809, *quoting Bentel v. United States*, 13 F.2d 327, 329 (2d Cir.), *cert. denied*, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926).

In view of the defendants' duty because of their roles as auditors and financial officer of the company, the jury instruction was proper.

### Q. JURY INSTRUCTIONS ON UNANIMITY

Lichtig, joined by Block and Weiner, contends that the court failed to instruct the

---

"If the evidence in the case leaves you with a reasonable doubt as to whether the accused in good faith believed the financial statements, auditors' certificates, and other written statements *to be true at the time they were made*, then you should acquit the accused.

"While I have stated that negligence or mistake does not constitute guilty knowledge or intent, nevertheless, ladies and gentlemen, you are entitled to consider in determining whether a defendant acted with such intent if he deliberately closed his eyes to the obvious or to the facts that certainly would be observed or ascertained in the course of his

portion of the accounting works, or whether he recklessly states as facts matters of which he knew he was ignorant.

"If you find such reckless, deliberate indifference to or disregard for truth or falsity on the part of a given defendant when considered in the light of all other evidence relating to intent, you may, but you need not necessarily, infer therefrom that such defendant acted willfully and knowingly. Such an inference, of course, depends upon the weight and credibility extended to the evidence of reckless and indifferent conduct, if any."

jury properly on the unanimity requirements for a finding of guilt on Count 6 and Counts 10 through 14.[29] These counts charged mail-fraud violations, and incorporated Count 2 and a portion of Count 1 which detailed specific wrongful acts. Lichtig argues that Counts 1 and 2 alleged acts occurring both while he was an auditor and while he was an executive of Equity Funding, that two distinct time periods were thus established, and that the jury should have been instructed that it had to be unanimous as to at least one time period.[30] Appellants also argue that there was a failure to instruct on the need for unanimity as to individual "acts or specifications" in a single count.

A reading of the jury instructions shows that the court separated out the six mail-fraud counts and instructed the jury that it had to find three elements in order to convict. The first two elements were the participation of the particular defendant in the offering or sale of securities where use was made of some manner of transportation in interstate commerce or of the mails. The third element contained three alternative subparts. As to this element the jury was instructed it also had to find that the defendant (1) willfully and knowingly employed any device, scheme, or artifice to defraud, or (2) willfully obtained money or property by utilizing untrue statements of material fact or by omitting statements of material fact which were necessary to make the statement accurate, or (3) willfully and knowingly engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a purchaser. Immediately following this instruction, the court continued:

> "Although it is necessary to prove only one of the three different subparts I have just mentioned, if you find one or more of such subparts has been proved, you must agree unanimously upon at least one of such subparts before you can convict for such offense."

The instruction outlined the elements, and, for the one portion where alternate findings were possible, clearly emphasized the necessity of unanimity. Unlike *United States v. Natelli*, 527 F.2d 311 (2d Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); and *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the jury here was properly instructed on unanimity and the various alternate bases were supported by the evidence. (See discussion on sufficiency of the evidence, Part O, *supra*.)

As to the necessity of instructing the jury that it had to agree unanimously in its verdicts on the individual acts specified in a given charge:

> " * * * [T]he defendants confuse the scheme to defraud, which is the gist of the offense, with the means adopted to effectuate that scheme. * * * " *Simons v. United States*, 119 F.2d 539, 549 (9th Cir.), *cert. denied*, 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496 (1941).

*See United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977). The charges against the defendants involved schemes to defraud, and the particular acts alleged were the means for carrying the general schemes into effect. The court sufficiently instructed the jury on the need for unanimity.

## R. FAILURE TO HAVE CERTAIN PROCEEDINGS RECORDED

Defendants contend that the trial court erred in failing to have three portions of the trial reported pursuant to the mandate of the Court Reporter Act, 28 U.S.C. § 753(b), that "all proceedings in criminal cases had in open court" be recorded verbatim. The proceedings that went unreported were: (1) the judge's action in ascertaining that the presence of two jurors on an elevator during a conversation between a government attorney and witness was

---

29. Block and Weiner also raise this issue in regard to Counts 80 and 84.

30. Block's and Weiner's incorporation of this argument is clearly meritless since Lichtig's argument is premised on his change in position.

harmless; (2) part of the discussion regarding the proposed jury instructions; and (3) a portion of the jury voir dire.

The first event has been dealt with in our discussion of alleged prejudicial communications, Part C, *supra*, where we find no significant basis for overruling the trial court. We further note that no explicit request for a court reporter was made by defendants at the time of the incident. *See United States v. Piascik*, 559 F.2d 545, 550 (9th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). There was no error in the court's handling of the situation.

As to the second incident, at the commencement of the discussion on the jury instructions the court stated, "It seems to me that we should let the reporter go, because I don't plan on making any rulings." No objection was made and the reporter was dismissed. Thereafter, Markowitz, attorney for Block, requested the presence of the reporter. A discussion on the record ensued and the judge informed counsel that he was willing to keep the reporter there, but that the "free discussion" they had been having would have to cease and each attorney would have to speak from the podium. The court assured counsel that they would be given an opportunity to make timely objections on the record. Markowitz agreed that if the making of a timely objection was shown on the record, there was no need for the reporter. The reporter was again excused. No objection was made by any counsel.

Defendants now contend that they are prejudiced because all of their arguments regarding the instructions are not available for review. As promised by the judge, their objections were reported in detail after a determination had been made as to what instructions were to be given. Defendants point to no objection that went unreported; they point only to unreported arguments in support of their objections. The objections were adequately preserved for our review, and no counsel has been bound merely to restating the arguments made below; they have in fact expanded on their arguments on appeal. Trial courts frequently discuss instructions in chambers before a record is made.

In addition, although this court has held that compliance with 28 U.S.C. § 753(b) is mandatory, we have also held that a waiver without personal consent of the defendant is permissible. *United States v. Piascik*, 559 F.2d at 549–50. Counsel here withdrew the objection to the reporter's absence and cannot now reassert it.

The last disputed incident involved the trial court's preliminary "administrative" voir dire of the prospective jurors. Before the case was formally called, the judge informed the array of jurors that those who wished to be excused should approach the bench individually, and he would then rule on the sufficiency of each excuse presented. *See* 28 U.S.C. § 1866(c). The individual excuses were not reported. When the case was called, defendants objected to the array and requested a new array in its stead. The objection was overruled, and regular voir dire was conducted.

Although we believe that the better procedure is to report everything said in the courtroom, a reversal is not necessary. Defendants allege no prejudice. The court's administrative transactions with jurors who had personal excuses preceded the calling of the case and the formal commencement of the proceedings. The preliminary screening of the array here, prior to the calling of the case for trial, presents no different situation than if the jurors had telephoned or written their requests. If something prejudicial to the case occurred, counsel could be depended upon to tell us what it was. There has been no hint of any irregularity. In *United States v. Piascik*, decided after the trial in this case, we stated:

> " * * * In the exercise of our supervisory powers, we *suggest* that court reporters be required to record (but not transcribe unless requested for appellate purposes) the *voir dire* examination of jurors * * * when requested by the court or counsel. * * * " 559 F.2d at 550 (Emphasis added).

**790**

### S. CONCLUSION

While it was not necessary to notice and discuss every point made by the appellants in their lengthy briefs, we have considered them all. Lichtig makes several other charges of improper tactics by government counsel which, when examined in the context of the trial, evaporate into harmless error, if indeed there was error at all. We do notice, however, Lichtig's point about the alleged failure of the government to comply with 18 U.S.C. § 3504. This section requires the government in certain situations to admit or deny certain types of surveillance. The standards for such disclaimers are adequately covered in *United States v. See*, 505 F.2d 845, 856 (9th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); *United States v. Vielguth*, 502 F.2d 1257, 1260 (9th Cir. 1974); *United States v. Alter*, 482 F.2d 1016, 1027 (9th Cir. 1973). We are satisfied, as was the trial court, that the affidavits of the prosecutor sufficiently answered all of Lichtig's checklist assertions of improper surveillance. The charges of misconduct leveled against the prosecutor, not unlike some of the other assignments of error, have been magnified in the hope that some pellet from the shotgun might fall upon a vulnerable spot. It is to the considerable credit of the judge who tried this complex case that the record is not only free from reversible error, but is remarkably clean in terms of the minor imperfections that creep into a long and involved trial.

Affirmed.